Filed 6/15/15  P. v. Goodwin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD GOODWIN,<br><br>    Defendant and Appellant. | D065440<br><br><br> (Super. Ct. Nos. SDC243102 & SCD247172) |

APPEALS from judgments of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Edward Goodwin appeals from two judgments, one following a jury trial (*People v. Goodwin* (Super. Ct. San Diego County, 2014, No. SCD243102) (SDC243102)), and one following a guilty plea (*People v. Goodwin* (Super. Ct. San Diego County, 2014, No. SCD247172) (SCD247172)).

In SDC243102, a jury convicted Goodwin of one count of first degree burglary of an inhabited dwelling while another person, other than an accomplice, was present in the residence (Pen. Code, §§ 459, 460, subd. (a), 667.5, subd. (c)(21))[1] and one count of first degree robbery while another person, other than an accomplice, was present in the residence (§§ 211, 212.5, subd. (a)). The court sentenced Goodwin, in part, to prison for one year four months to be served consecutively on each of the two counts.

In SDC247172, as relevant to the issues on appeal, Goodwin pleaded guilty to one count of receiving stolen property (§ 496, subd. (a)) and one count of first degree burglary[2] (§§ 459, 460, subd. (a)). With enhancements, the court sentenced Goodwin to prison for 10 years eight months, to be served consecutively to the term imposed in SDC243102; and as pertinent to the issues on appeal, the court imposed a restitution fine of $10,000 (§ 1202.4, subd. (b)).

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    As part of the plea, Goodwin also admitted two enhancement allegations to the burglary offense. (§ 667.5, subd. (c)(21) [another person, other than an accomplice, was present in the residence at the time of the first degree burglary]; § 12022.1, subd. (b) [defendant out on bail at time of charged offense].)

On appeal, Goodwin raises three issues from SDC243102 and one issue from SDC247172.  In the appeal from SDC243102, Goodwin argues:  (1) because his actions in the burglary and robbery constituted a single course of conduct with a single objective, section 654 precluded the court from imposing consecutive sentences; (2) the record lacks substantial evidence to support the jury's finding that Goodwin's burglary was a violent felony under section 667.5, subdivision (c)(21); and (3) the court erred in admitting testimony as to Goodwin's prior conviction for second degree commercial burglary.  In the appeal from SDC247172, Goodwin argues that the court abused its discretion in setting the section 1202.4, subdivision (b) restitution fine at $10,000.

As we explain, we do not find any error and will affirm both judgments.

I.

FACTUAL AND PROCEDURAL BACKGROUND[3]

A.    *SDC243102*

Deborah Johnston and her husband lived in the Clairemont area of San Diego.  On August 10, 2012, with her husband out of town, Johnston left her home midmorning to meet friends for brunch at 11:00 a.m.  She locked the doors, but left the windows open and the ceiling fans on due to the warm weather.  She returned home around 1:00 p.m., parked her car in the attached garage and entered the residence in the kitchen-dining room area.

---

[3]    We recite the facts and inferences from facts in a light most favorable to the judgments.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

3

After setting her purse down on a counter, Johnston heard a noise from the back of the house that frightened her; her husband was out of town, and nobody should have been in the house. Johnston began calling out, " 'Is somebody here? Is somebody back there?' " and started down a hallway that led to the bedrooms. As Johnston approached the end of the hallway, a man — whom Johnston later identified as Goodwin — came out of the back bedroom, charging toward her. Johnston reacted by shrieking and screaming that he should " 'Get out of my house.' " Goodwin had one of Johnston's suitcases in his right hand, and he had his left arm in front of his mouth and nose in a V-shape with his elbow protruding forward. Although Johnston attempted to push Goodwin back toward the bedrooms in the narrow hallway, he continued charging toward her, forcing her back down the hallway, causing her to fall backward over a coffee table in the living room. Goodwin continued on through the living room, leaving through the front door.

Johnston chased Goodwin down the steps of the front porch, onto the front patio and down the front walkway, screaming " 'thief' " and " 'I have been robbed,' " hoping that someone would hear and help her. Someone did — a contractor who identified Goodwin at trial. The contractor had been working on the side of a house across the street from Johnston's when he heard Johnston's screams; and as he came to the front of the house, he saw Goodwin burst out of Johnston's house carrying the suitcase.

Goodwin, suitcase in hand, ran to and entered a white Chevrolet automobile that was parked in front of Johnston's house, facing in a direction to exit the cul-de-sac and neighborhood. Neither Johnston nor the contractor was able to stop Goodwin, but

4

Johnston noted the license plate number of the Chevrolet and immediately went inside her house and called 911 to report the incident.

Johnston found the top drawer of each nightstand in each bedroom opened, and the bedroom in which she had kept her jewelry "had been ransacked" with the empty jewelry boxes strewn across the floor. All of Johnston's jewelry, including irreplaceable family heirlooms, was missing — as well as her Kindle and items from her husband's armoire.

The police officers who responded to the 911 call arrived quite quickly, and around 3:00 p.m. that afternoon a detective came to the house and showed Johnston a series of photographs from which she was able to identify Goodwin as the person whom she earlier had chased out of her home.

Meanwhile, from the information Johnston and the contractor supplied initially, the police tracked down and located the white Chevrolet. It was a rental car, leased to Goodwin, and at 3:15 p.m. that afternoon it was parked in a stall behind an apartment rented to Goodwin.

The police immediately obtained a search warrant, and in the search of Goodwin's apartment later that same evening they found: a white T-shirt that matched the description that Johnston had given of what the perpetrator had been wearing; and a car rental agreement in Goodwin's name for the white Chevrolet. The police impounded the vehicle that night, and a subsequent search disclosed personal items belonging to Goodwin. Further investigation revealed: near the front porch of Johnston's home next to the front door, a screen (on an open window) that was intact when Johnston left her home on the date of the crime was torn later that same the day; the white T-shirt

5

contained evidence of Goodwin's DNA and plant material from a particular species of plant (kangaroo paw, which has "hairs" that are "unique") located at the front entry of Johnston's house; and a cellular telephone associated with Goodwin was at or near Johnston's residence at the time of the crime.

With this evidence (and other evidence which we will discuss as necessary in the Discussion, *post*), in July 2013, a jury found Goodwin guilty of one count of first degree burglary of an inhabited dwelling while another person, other than an accomplice, was present in the residence (§§ 459, 460, subd. (a), 667.5, subd. (c)(21)) and one count of first degree robbery while another person, other than an accomplice, was present in the residence (§§ 211, 212.5, subd. (a)). As relevant to the issues Goodwin raises on appeal, the court sentenced Goodwin to prison for *consecutive* terms of one year four months on each of the two counts.

Goodwin timely appealed from the judgment.

B.     *SDC247172*

In SDC247172, Goodwin pleaded guilty to five counts and was sentenced to 10 years eight months in prison. Because the only issue Goodwin raises in his appeal in this case — i.e., the amount of the restitution fine — depends in part on "the seriousness of the offense" (§ 1202.4, subd. (b)(1)), we present an abbreviated version of the facts underlying the one count that resulted in the fine.[4]

---

[4]     Since there was no trial, we rely on the transcript from the preliminary hearing and the probation report in reciting the facts.

On June 15, 2013, "[f]earing for her safety," victim Jenna May fled through the back door of her house, after hearing the door bell ringing and continuous knocking on the front door and observing Goodwin using a crowbar to pry open the door. Safely at her neighbor's, May called the police, who promptly arrived and arrested Goodwin after he had left May's house and had jumped the fence into the neighbor's back yard. Goodwin was in possession of burglary tools and the property he had taken from May's, which included prescription narcotics.

The only count of the information relevant to this appeal is that for first degree burglary.[5] (§§ 459; 460, subd. (a).) At sentencing, in addition to imposing a prison term and routine fines and assessments not at issue in this appeal, the court ordered Goodwin to pay a restitution fine of $10,000 under section 1202.4, subdivision (b).

Goodwin timely appealed from the judgment.

## II.

## DISCUSSION

A. *SDC243102*

Goodwin raises three arguments in his appeal from the judgment in SDC243102. Two have to do with sentencing issues, and one has to do with an evidentiary ruling during the trial. None has merit.

---

[5] In addition, Goodwin pleaded guilty to one felony count of receiving stolen property (§ 496, subd. (a)); and three misdemeanor counts of vandalism (§ 594, subds. (a) & (b)), possession of burglary tools (§ 466) and resisting arrest (§ 148, subd. (a)(1)). He also admitted allegations of enhancements to the burglary offense (§§ 667.5, subd (c)(1), 12022.1, subd. (b)).

7

1.      *The Court Did Not Err Under Section 654 in Imposing Consecutive Sentences on the Counts for Burglary and Robbery*

Once again, the court sentenced Goodwin to one year four months on the conviction for burglary and a consecutive one year four months on the conviction for robbery.  Goodwin contends that section 654 precludes imposition of consecutive sentences, because the offenses of burglary and robbery were committed in an individual course of conduct with a single objective — to steal Johnston's personal property.  The People disagree, emphasizing that Goodwin's original intent was only to burglarize an empty residence, whereas he formed a separate intent to commit robbery once Johnston returned home and confronted him.

Section 654 provides in relevant part:

"(a)     An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

As such, it prohibits punishment for two crimes arising from a single indivisible course of conduct.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)  Thus, if all of the crimes are " ' "incident to one objective," ' " then the defendant may receive only one punishment. (*People v. Capistrano* (2014) 59 Cal.4th 830, 885; see *Latimer*, at p. 1208; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.' "  (*People v. Correa* (2012) 54 Cal.4th 331, 336; see *Capistrano*, at pp. 885-886.)  " ' "The defendant's intent and objectives are factual questions for the trial court; [to permit multiple punishments,] there must be

8

evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced." ' " (*Capistrano*, at p. 886.)

Where, as here, the trial court sentences a defendant to separate terms without an express finding that the defendant entertained separate objectives, the trial court is deemed to have made an implied finding that each offense had a separate objective. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.) " ' " 'A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence.' " ' " (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368.) Thus, under this standard, we review the trial court's implied section 654 determination of a defendant's separate intent and objective "in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

We believe *People v. Dugas* (1966) 242 Cal.App.2d 244 (*Dugas*) is factually indistinguishable and, accordingly, controlling. In *Dugas*, the jury convicted the defendant of burglary and robbery. (*Id.* at p. 246.) The evidence at trial supported the trial court's implied findings that, at a time when the victim was not in his residence, the defendant broke into and entered the residence with the intent to steal; that the burglary (consisting of the breaking and entering with the intent to commit a theft) had taken place by the time the victim returned home; and that the defendant formed the intent to commit a robbery (consisting of the taking of property by force against a person's will from the person's possession and immediate presence), as opposed to a theft (consisting of the

9

taking and keeping of another person's property without that person's consent), only after the victim returned and entered his residence. (*Id.* at pp. 250-251.) Under such circumstances, because "the two crimes cannot be deemed part of an indivisible transaction incident to the same objective," the defendant's separate punishments for burglary and for robbery did not violate section 654.[6] (*Dugas*, at p. 251.)

Likewise, here, Goodwin's separate punishments for burglary and for robbery do not violate section 654. The evidence from the trial supports the trial court's implied finding that, for purposes of analyzing Goodwin's intent or objective, the burglary had already been accomplished when Johnston returned home.[7] (*People v. Escobar* (1992) 7 Cal.App.4th 1430, 1436 (*Escobar*) ["the crime of burglary is complete once the perpetrator enters the premises with the requisite intent" to commit a felony].) The fact that Goodwin likely tore the screen and entered through a window next to the front door during the middle of the day supports an implied finding that Goodwin believed no one was inside.[8] The fact that Goodwin did not put anything in Johnston's suitcase after she

---

[6] The result is no different where the victim is inside the residence at the time of the entering, but the defendant only learns of the victim's presence after the completion of the burglary and prior to the commission of the robbery. (*People v. Green* (1985) 166 Cal.App.3d 514, 518 (*Green*).) Under such circumstances, the sentencing restrictions of section 654 were not implicated, because "the burglary and robbery did not constitute an indivisible course of conduct." (*Ibid.*)

[7] Indeed, in his opening brief, Goodwin concedes: "The crime of burglary was complete when [Goodwin] entered the residence."

[8] Without conceding *his knowledge* at the time he entered the residence, Goodwin tells us that in the trial court, "It was undisputed Johnston was not present when the residence was entered . . . ."

confronted him, yet jewelry and other personal effects were missing immediately upon Goodwin's flight, supports an implied finding that Goodwin had completed the theft by the time Johnston returned home. Correspondingly, the fact that Johnston returned home and surprised Goodwin supports an implied finding that Goodwin formulated his intent to commit a robbery only after he had completed the theft.

In the language of the *Dugas* opinion, here "the evidence justifies the conclusion that [Goodwin's] original intent was to burglarize an empty [house] and that the robbery occurred as an afterthought when [Johnston] returned and surprised him in the commission of the burglary." (*Dugas*, *supra*, 242 Cal.App.2d at p. 250.) Consistent with the holding in *Dugas*, therefore, multiple punishments for the burglary and for the robbery were proper here, because the "the two crimes did not comprise one indivisible transaction." (*Id.* at p. 251.) Rather, the conviction for each crime here was based on a distinct criminal intent and objective. (*Ibid*.)

Without mentioning *Dugas* or *Green* (the Attorney General's principal authorities in support of the People's position), Goodwin suggests he only "harbored a single objective — to commit a theft." Even if we assume that the record contains evidence supporting the finding Goodwin asks us to reach, that is not the standard of review we apply. Rather, our review is limited; we may not reverse the trial court's implied finding that Goodwin had a separate intent and objective for each offense " 'if there is any substantial evidence to support it.' " (*People v. McCoy* (1992) 9 Cal.App.4th 1578,

11

1585.) As we explained *ante*, the record here does contain substantial evidence that supports the court's implied finding.

Accordingly, the court did not err in imposing consecutive sentences on the counts for burglary and robbery.

2.  *For Purposes of Section 667.5, Johnston Was in the Residence During Goodwin's Commission of the Burglary*

As part of its verdict on the burglary count, the jury found that Goodwin committed the burglary "while another person, other than an accomplice, was present in the residence within the meaning of [section 667.5, subdivision (c)(21)]." As such, for certain purposes, the burglary is considered a " 'violent felony.' " (§ 667.5, subd. (c)(21).) While not directly relevant to the issues on appeal — e.g., there is no issue regarding an enhancement based on prior conviction for a violent felony under section 667.5 — Goodwin tells us that this section 667.5, subdivision (c)(21) finding adversely affected (and will continue to affect) his ability to receive custody credits toward his sentence. (See § 2933.1, subd. (b); *People v. Garcia* (2004) 121 Cal.App.4th 271, 277 (*Garcia*).)

Goodwin argues on appeal that this violent felony finding cannot stand, because the burglary was complete upon Goodwin's entry into the residence, yet it was "undisputed Johnston was not present when the residence was entered" by Goodwin.[9] In response, the People argue that evidence of Johnston's presence in the residence *at any time* until Goodwin left the residence is sufficient to support the finding that she "was

---

[9] Likewise, however, Goodwin does not dispute that Johnston was present in the residence while he was in the bedroom, hallway and living room before he fled the residence.

12

present in the residence 'during the commission of the burglary' " for purposes of section 665.7, subdivision (c)(21).

We begin by agreeing with Goodwin that, for purposes of substantive criminal law, he committed a burglary at the time he entered Johnston's home with the intent to steal. (§ 459 ["Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary."]; *Escobar*, *supra*, 7 Cal.App.4th at p. 1436 ["the crime of burglary is complete once the perpetrator enters the premises with the requisite intent" to commit a felony].) However, that is not the end of the inquiry. Just because the crime of burglary may have been complete for purposes of a conviction "does not dictate the conclusion that the crime is complete for *all* purposes." (*People v. Walls* (1978) 85 Cal.App.3d 447, 453 (*Walls*), italics added [burglary with sentence enhancement under § 12022.7], quoted approvingly in *People v. Elder* (2014) 227 Cal.App.4th 411, 424 (*Elder*) [robbery with sentence enhancement under § 12022.7].)

As applicable here, section 2933.1, subdivision (a) limits the amount of "worktime credit" for "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5"; and section 667.5, subdivision (c) lists among the felony offenses "[a]ny burglary of the first degree . . . wherein it is charged and proved that another person, other than an accomplice, was present in the residence *during the commission of the burglary*" (*id.*, subd. (c)(21), italics added). " 'In considering the words of a statute, an appellate court is required to read the enactment in the light of the objective sought to be achieved by it as well as the evil sought to be averted.' " (*Elder*, *supra*, 227 Cal.App.4th at p. 423.) While the mere list of violent felonies in section 667.5, subdivision (c) does

13

not suggest an objective sought to be achieved, our Legislature has told us that the evils sought by be averted in the list are "society's condemnation for these extraordinary crimes of violence against the person."[10] (Stats. 2006, ch. 337, § 30, p. 2636.)

Given this statutory context, we have no difficulty concluding that, for purposes of section 667.5, subdivision (c)(21), Johnston was "present in the residence *during the commission of the burglary*" as found by the jury. (*Ibid.*, italics added.) Consistent with *People v. Alvarado* (2001) 87 Cal.App.4th 178, we hold that the phrase "during the commission of the burglary" in section 667.5, subdivision (c)(21) "includes the period of time that a burglar remains on the premises after entry and extends until the burglar has reached a place of temporary safety." (*Id.* at p. 183 [§ 667.61, subds. (b) & (e)(2) mandate indeterminate life terms for those who commit a rape "during the commission of a burglary"].) That is because, "*our courts have always recognized the concept that the burglary continues after entry with the requisite intent, is effected*." (*Walls*, *supra*, 85 Cal.App.3d at p. 453, italics added [sentence enhancement for use of a weapon and commission of an assault during a burglary].)

We find further support in *People v. Montoya* (1994) 7 Cal.4th 1027, where, for purposes of assessing aider and abettor liability, "a burglary is considered ongoing during the time the perpetrator remains inside the structure" (*id.* at p. 1045); in *People v. Miller*

---

10    In looking at the specific application of the violent felony here, the objective sought to be achieved *in section 2933.1* is "a legitimate policy decision by the Legislature to provide greater protection to the public from dangerous offenders who might otherwise be paroled at an earlier date." (*Garcia*, *supra*, 121 Cal.App.4th at p. 277.)

(1977) 18 Cal.3d 873, where, for purposes of sentence enhancement, a shooting was considered "in the commission" of a burglary when a security guard was shot well after defendants' entry to the jewelry store with the intent to commit a felony (*id.* at p. 882); in *Elder*, *supra*, 227 Cal.App.4th at page 423, where, for purposes of sentence enhancement, " 'the crime [of burglary] is not complete until the felon has won his way to a place of temporary safety' " (quoting from *People v. Johnson* (1980) 104 Cal.App.3d 598, 608); and in *Walls*, *supra*, 85 Cal.App.3d at page 453, where, for purposes of sentence enhancement, the use of a weapon and commission of an assault were considered to take place " 'in the commission' " of the burglary, even though defendants did not acquire the weapon or assault the victim until after well entry with the intent to commit a felony, because "it matters not whether injury was inflicted upon the occupant at the time the burglar gained entry or after the entry was effected."

Accordingly, the court did not err in entering a judgment with the special verdict finding that Goodwin committed the burglary while Johnston "was present in the residence within the meaning of [section 667.5, subdivision (c)(21)]."

3. *Goodwin Was Not Prejudiced by the Introduction into Evidence of His Prior Conviction*

During trial, the court allowed the People to present evidence of an incident in May 2005 following which Goodwin was convicted of felony commercial burglary.[11] In short, Goodwin and an accomplice stole approximately $900 worth of electronics from a

---

[11] From what we can tell, the evidence was only of the incident and not of the later conviction.

15

K-Mart, and when the store security guard attempted to place him under arrest in the parking lot, he swung at the guard, hit her in the face and ripped her shirt, causing her to fall to the ground as Goodwin fled the scene.

Goodwin argues that the evidence of the prior incident was inadmissible under Evidence Code section 1101, and that the error was prejudicial. The People do not present any argument regarding the admissibility of the evidence of the K-Mart incident, instead contending only that Goodwin did not meet his burden of establishing prejudice. Because we agree that any potential error was harmless, we will assume without deciding that evidence of the May 2005 incident at K-Mart was inadmissible.[12]

As Goodwin acknowledges, however, erroneous admission of evidence of a prior crime does not automatically result in a reversal. Goodwin appropriately accepts that he must also establish prejudice, which for this alleged error requires a showing of a reasonable probability that "a result more favorable to defendant would have been reached had the jury not been informed of the prior[ crime]. *People v. Watson* (1956) 46 Cal.2d 818, 836.)" (*People v. Malone* (1988) 47 Cal.3d 1, 17, 20-22 [evidence of defendant's prior murder conviction]; see *People v. Holloway* (2004) 33 Cal.4th 96, 128 (*Holloway*).)

---

[12] With exceptions that are irrelevant in light of our assumption, "evidence of a person's character or a trait of his or her character (whether in the form of . . . evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a); accord *People v. Gray* (2005) 37 Cal.4th 168, 202 [evidence of prior crime not admissible to show defendant's disposition to commit charged offense].)

16

Given this standard, any error in admitting evidence of the K-Mart incident was not prejudicial.

On three separate occasions, Johnston positively identified Goodwin as the person she encountered in her home: (1) within two hours of their meeting in Johnston's hallway, Johnston identified Goodwin during a photographic lineup; (2) approximately two months later, Johnston identified Goodwin immediately before and at the preliminary hearing; and (3) at trial less than a year later, Johnston identified Goodwin in the courtroom before the jury. Likewise, the contractor (who had confronted the perpetrator as he left Johnston's house with the suitcase) identified Goodwin at trial as well.

In addition, within hours of the crime, the police recovered a white T-shirt from Goodwin's apartment that (1) matched Johnston's description of the T-shirt worn by the man in her home earlier that day; (2) contained Goodwin's DNA; and (3) had certain plant material on it from a "pretty rare" species of plant, kangaroo paw. In this latter regard, Johnston had kangaroo paw plants outside and in front of her home in the exact location where the perpetrator had run as he left the home, and there were no kangaroo paw plants in or around Goodwin's apartment building from which the police seized the T-shirt later the same day.

Further, the People presented uncontroverted evidence tying Goodwin to the car the perpetrator used in his getaway from Johnston's home. Johnston was directly behind the car as it was being driven away, and she was able to give the police the car's make, color and license plate number "immediately" after she ran back inside her house. Later that afternoon, the police found the car parked in a stall in the rear of Goodwin's

17

apartment building. The police learned that Goodwin recently had rented the car, using his name and the address of his apartment; and when they searched his apartment that night, the police found the car rental receipt with Goodwin's name and telephone number on it. In searching the car, the police also found personal items belonging to Goodwin, including a day planner with Goodwin's name and telephone numbers.

Finally, a cellular telephone with a number connected to Goodwin[13] was used many times near Johnston's residence between 11:35 a.m. and 1:05 p.m. on the day of the crimes. At 11:34 a.m. — approximately one and a half hours before Johnston returned home to find the perpetrator — a call was placed on the phone from a location "right near" Goodwin's address; a minute later there was another call placed on the phone from a location "about a half mile from" Goodwin's address; at 12:01 p.m., a call was placed on the phone from a location "approximately one mile from the crime scene . . . and 5.5 miles from Mr. Goodwin's residence"; shortly before the time Johnston returned home, between 12:46 p.m. and 12:49 p.m., four calls were placed on the phone — three from a location "just about 150 yards" from Johnston's residence and one from a location "approximately one mile" from Johnston's residence; at 1:02 p.m., the phone received a call (from one of the numbers called during the prior hour) when the phone was "approximately one mile" from Johnston's residence; at 1:05 p.m. the phone received a

---

13    The personal information portion of Goodwin's day planner listed the telephone number as his. The rental agreement for the white Chevrolet getaway car was in Goodwin's name and disclosed this same telephone number. Finally, when Goodwin was arrested for the burglary and robbery, he provided this telephone number along with the other booking information.

18

call when the phone was "roughly about a mile" from Johnston's residence; and 25 minutes later a call was placed on the phone (to the number from which the immediately preceding call was placed) from a location "approximately half a mile" from Goodwin's residence.[14] Based on the locations of this phone, the People's expert testified that his "*first indication*" the phone had left the area around Johnston's house was the call the phone received at 1:05 p.m. — which was approximately five minutes after Johnston had returned home and found the perpetrator and two minutes after Johnston had called 911. (Italics added.)

Goodwin argues that, "given the closeness of the case," "it is reasonably probable a different result would have occurred had the evidence of the 2005 K-Mart incident been excluded." We disagree that the case was close. First, we are not persuaded by Goodwin's argument that the police did not find the items stolen from Johnston's home in Goodwin's apartment or car. Johnston called 911 shortly after 1:00 p.m., the police did not arrive at (and maintain surveillance of) Goodwin's apartment until almost 3:15 p.m., and the police did not search Goodwin's apartment or impound the white Chevrolet getaway car until later that night — all of which gave Goodwin a significant amount of time to hide or otherwise dispose of one suitcase and its contents. Second, we are not persuaded by Goodwin's suggestion that Johnston's and the contractor's estimates of the height of the perpetrator on the day of the crimes — as the perpetrator was running,

---

14     Later in the day, calls were placed on the phone from locations within four miles of Goodwin's apartment.

shoving and escaping, all in a matter of minutes — were materially inaccurate.[15]  At most, their estimates of Goodwin's height were 7 percent off.  In any event, both Johnston and the contractor described other physical attributes of Goodwin; and Johnston picked out Goodwin from a photo lineup just hours after the incident, Johnston identified Goodwin at the preliminary hearing, and both Johnston and the contractor identified Goodwin at trial.  Finally, we are not convinced by Goodwin's reliance on the fact that kangaroo paw plants may be commonly found in San Diego.  The following evidence was uncontested:  the perpetrator ran through kangaroo paw plants near Johnston's door as he escaped from Johnston's house; later the same day, the police recovered from Goodwin's apartment a white T-shirt containing both Goodwin's DNA and residue consistent with the kangaroo paw plants in Johnston's yard; and the white T-shirt, seized the same day as the crimes, matched Johnston's description of what the perpetrator had been wearing at her house.

Accordingly, given the overwhelming evidence of Goodwin's guilt of the crimes charged, there is no reasonable probability that a verdict more favorable to him would have been reached had the evidence of the 2005 K-Mart incident been excluded.  (*People v. Watson*, *supra*, 46 Cal.2d at pp. 835-837.)  Thus, even assuming (without deciding) that such evidence was inadmissible under Evidence Code section 1101, we do not conclude that the admission of this evidence caused a miscarriage of justice requiring a

---

[15]    Johnston initially told the police the perpetrator was 6' 1" tall, later stating he was 6' 4"; at trial, the contractor told the police that the man in the getaway car was "around six feet" tall; and the probation report indicates Goodwin is 6' 6" tall.

reversal of the judgment.  (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); see

*Holloway*, *supra*, 33 Cal.4th at p. 128.)

B.     *SDC247172*

In sentencing Goodwin following his plea of guilty to the charges of burglary and

receiving stolen property, the court ordered a section 1202.4 restitution fine of

$10,000.[16]  Section 1202.4 provides in relevant part:

> "(a)(1) It is the intent of the Legislature that a victim of crime who incurs
> an economic loss as a result of the commission of a crime shall receive
> restitution directly from a defendant convicted of that crime.  [¶]  . . .  [¶]
> (3) The court, in addition to any other penalty provided or imposed under
> the law, shall order the defendant to pay . . . [¶] . . . [a] restitution fine in
> accordance with subdivision (b). . . .  [¶]

> "(b) In every case where a person is convicted of a crime, the court shall
> impose a separate and additional restitution fine . . . .  [¶]  (1) The
> restitution fine shall be set at the discretion of the court and commensurate
> with the seriousness of the offense.  If the person is convicted of a felony,
> the fine shall not be less than . . . three hundred dollars ($300) starting on
> January 1, 2014, and not more than ten thousand dollars ($10,000)[17] . . . .
> [¶]  (2) In setting a felony restitution fine, the court may determine the
> amount of the fine as the product of the minimum fine pursuant to
> paragraph (1) multiplied by the number of years of imprisonment the

---

16     The court also ordered a section 1202.45 parole revocation fine of $10,000.
Goodwin presents argument only as to the section 1202.4 restitution fine, not to the
section 1202.45 parole revocation fine.  By failing to present any argument or authority
challenging the section 1202.45 parole revocation fine, Goodwin has forfeited any
independent basis on which to object to it.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793
[legal argument without citation of authority may be deemed waived].)

17     Goodwin contends that, because he was *convicted* in 2013, the pre-2014 minimum
amount is what should be considered.  We disagree.  The statutory language is clear; the
minimum amount "shall not be less than" $300 "*starting on January 1, 2014*." (§ 1202.4,
subd. (b)(1), italics added.)  The statute does not mention the date of conviction.

21

defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted.

"(c) The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. . . .

"(d) In setting the amount of the fine pursuant to subdivision (b) in excess of the minimum fine pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. . . . A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required."

Goodwin argues that the court abused its discretion in setting the amount of the fine at $10,000 on the following grounds: (1) the court misapplied section 1202.4, subdivision (b)'s formula for calculating the amount; (2) the court did not support its decision by providing what Goodwin contends are required reasons or considerations for setting the amount; and (3) the court did not consider the appropriate relevant factors, set forth in subdivision (d) of section 1202.4, in setting the amount.

In response, the People contend: (1) Goodwin forfeited his claim regarding the amount of the restitution fine, because he failed to object in the trial court; and, in any event (2) the court did not abuse its discretion in setting the amount of the fine, because the court complied with section 1202.4's requirements in determining and explaining the amount of the fine.

22

We agree that Goodwin forfeited his claim by failing to object in the trial court and, accordingly, do not reach his substantive arguments.

In both *People v. Nelson* (2011) 51 Cal.4th 198 (*Nelson*) and *People v. Gamache* (2010) 48 Cal.4th 347 (*Gamache*), each defendant argued on appeal that the trial court erred in imposing a $10,000 section 1202.4 restitution fine by failing to take into consideration his ability to pay, as required by subdivision (d). (*Nelson*, at p. 227 & fn. 22; *Gamache*, at p. 409.) In both *Nelson* and *Gamache*, our Supreme Court ruled unequivocally that each defendant "forfeited this claim by failing to object at his sentencing hearing." (*Nelson*, at p. 227; *Gamache*, at p. 409.) We find these authorities dispositive of the issue here.

No doubt anticipating the People's argument, in his opening brief Goodwin argues that his "failure to object to the trial court's imposition of the $10,000 restitution fine does not result in the forfeiture of the issue on appeal," citing *People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1397 (*Pacheco*), and *People v. Kunitz* (2004) 122 Cal.App.4th 652, 657 (*Kunitz*). We acknowledge that both *Pacheco* and *Kunitz* ruled that the defendant had not forfeited his claim on appeal by failing to raise it in the trial court. (*Pacheco*, at p. 1397; *Kunitz*, at p. 657.)

However, in *Pacheco* the court's comment regarding the failure to raise a claim in the trial court had nothing to do with a section 1202.4 victim restitution fine; rather, the defendant there claimed sentencing error related to a criminal justice administration fee (Gov. Code, §§ 29550, subd. (c), 29550.2), a probation fee (§ 1203.1b) and an attorney fee order (§ 987.8). (*Pacheco*, *supra*, 187 Cal.App.4th at p. 1397.) Moreover, with

23

regard to the Government Code section 29550.2 fee and the section 1203.1b fee, the statement on which Goodwin relies in *Pacheco* — namely, that there is no need to object in the trial court in order to preserve the issue on appeal (*Pacheco*, at p. 1397) — was expressly disapproved in, respectively, *People v. McCullough* (2013) 56 Cal.4th 589, 597, 599 (*McCullough*) (Gov. Code, § 29550.2 booking fee), and *People v. Trujillo* (2015) 60 Cal.4th 850, 858, and footnote 5 (*Trujillo*) (§ 1203.1b probation fee).[18]

Likewise, *Kunitz* is not helpful to Goodwin. Even though the restitution fines at issue were the same as those in the present appeal, the issue on appeal in *Kunitz* was whether sections 1202.4 and 1202.45 authorized restitution fines "to be payable jointly and severally by both defendants." (*Kunitz*, *supra*, 122 Cal.App.4th at p. 655.) There, the court ruled that, *as a matter of law based on statutory interpretation*, because neither section 1202.4 nor section 1202.45 allowed a fine against more than one individual, a restitution fine should be specific to a defendant. (*Kunitz*, at pp. 655-657 [both statutes refer to "a person" or "the defendant" in the singular, distinguishing other instances where the singular includes the plural].) The court then distinguished between an *unauthorized* fine — where, as in *Kunitz*, "the statutes do not provide for imposition of a fine payable jointly and severally by two or more defendants" — and an *authorized but erroneous* fine. (*Id.* at p. 657.) As applicable here, *Kunitz* teaches that, because the fine was s*tatutorily unauthorized*, the defendant did not forfeit appellate review by failing to

---

18     In their brief, the People point out that *McCullough* and *Trujillo* disapproved the statement in *Pacheco* on which Goodwin had relied in his opening brief. Ignoring this Supreme Court authority, Goodwin inappropriately continues to rely on *Pacheco* in his reply brief.

object in the trial court.  (*Ibid.* at p. 657.)  In contrast, here Goodwin's arguments are all directed to the allegedly erroneous nature of an otherwise *statutorily authorized* fine of $10,000 under section 1202.4.

Accordingly, by failing to object in the trial court, Goodwin forfeited appellate review of his arguments related to the amount of the section 1202.4 restitution fine. (*Nelson*, *supra*, 51 Cal.4th at p. 227; *Gamache*, *supra*, 48 Cal.4th at p. 409; see *Kunitz*, *supra*, 122 Cal.App.4th at p. 657.)

## DISPOSITION

The judgments in SDC243102 and SDC247172 are affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.

25